NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MATTHEW L. HANCOCK, | : |
| Plaintiff, | : Civil No. 13-4424 (RBK) |
| v. | : **OPINION** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | : |
| Defendant. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Matthew Hancock ("Plaintiff") from the decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff supplemental security income ("SSI") pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g). For the reasons expressed below, the Court will vacate the Commissioner's decision that Plaintiff is not entitled to SSI, and remand the matter to the Administrative Law Judge ("ALJ").

**I.   BACKGROUND**

**A.  Procedural History**

Plaintiff protectively filed an application for SSI benefits on October 16, 2009, alleging disabilities of Anxiety Disorder and Slight Mental Impairment, beginning June 6, 2005. Tr. 13. Later, Plaintiff amended the alleged onset date to October 16, 2009. Tr. 258-59. Plaintiff's claim was denied on April 22, 2010. Tr. 13. Plaintiff's claim was denied again on reconsideration on August 2, 2010. Id. On September 3, 2010, Plaintiff requested a hearing by

1

an ALJ.  Tr. 64.  The hearing was held on June 28, 2011, before the Honorable Jonathan Wesner.  Tr. 25.  The ALJ issued an unfavorable decision on July 18, 2011.  Tr. 10-20.  Thereafter, Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council on September 7, 2011.  Tr. 9.  The Appeals Council denied Plaintiff's Request for Review on May 17, 2013.  Tr. 1.  Plaintiff filed this action on July 22, 2013, seeking district court review of the ALJ's decision.

### B.  Plaintiff's Medical History

Plaintiff, born July 2, 1981, graduated <u>summa cum laude</u> in December 2004 from Widener University with a degree in Civil Engineering.  Tr. 28, 40.  Regarding his success in college, Plaintiff testified that he was able to spend as much time as he needed on homework, Tr. 36, and "I could study for as much or as little as I wanted to," Tr. 39.  However, during his senior year, "I finally realized that I did have a mental impairment and then I basically just totally shut down.  I was having anxiety problems, depression problems.  I didn't graduate on time.  I had to take an extra two semesters to graduate."  Tr. 40.  Plaintiff has one month of past relevant work experience as an Auto Cad draftsperson, a position he held in May of 2005.  Tr. 30.

#### i.  Dr. Goldberg's Evaluation

Dr. Kenneth Goldberg, a psychologist, evaluated Plaintiff on August 28, 2006.  Tr. 264.  Shortly before this evaluation, on June 16, 2006, Plaintiff underwent an EEG that was "mildly abnormal," showing that he had a "cognitive impairment."  Tr. 285.  Dr. Goldberg administered the Wechsler Adult Intelligence Scale – Third Edition during his evaluation of Plaintiff.  Tr. 265-66.  This test revealed a Verbal IQ ("VIQ") of 111, and a Performance IQ ("PIQ") of 91.  Tr. 266.  Dr. Goldberg noted that there was a "marked disparity between verbal and performance IQ scores," and that this was "consistent with the notion that [Plaintiff] has a cognitive problem."

Id.  He noted that "the IQ test gives direct information to support [Plaintiff's] claim that he has a problem with work pace."  Id.  Dr. Goldberg reported that Plaintiff "works at a very slow pace.  In school, he could find a space to work by himself without anyone else depending on his product or watching what he did.  In the work force, he had to now perform on a team and in front of others."  Tr. 267.  However, Dr. Goldberg also thought that his IQ test indicated that Plaintiff could perform college level work and perform at a professional level.  Tr. 266.  Dr. Goldberg diagnosed Plaintiff with a Learning Disorder, Dysthymic Disorder, and Personality Disorder.  Tr. 269.

### ii. Dr. Glass's Treatment Notes and Reports

Plaintiff began seeing a psychiatrist, Dr. Joel Glass, on April 17, 2006, with a diagnosis of anxiety, obsessive-compulsive disorder, learning disability, and major depressive disorder.  Tr. 271.  On August 1, 2008, Plaintiff reported to Dr. Glass increased anxiety and tension in his head.  Tr. 291.  Medications prescribed by Dr. Glass at this time included both Sertraline and Alprazolam.  Id.  Plaintiff was also on Lexapro.  Tr. 292.  At his September 15, 2008 visit, Plaintiff reported that he had been feeling bad since his dosage of Seroquel had been decreased from 200 mg to 100 mg.  Id.  He had been experiencing decreased sleep, with one or more awakenings per night.  Id.  He also experienced increased anxiousness when using Alprazolam.  Id.  On September 22, 2008, Plaintiff reported that his panic and anxiety were constant, and his appetite had decreased.  Tr. 293.  Plaintiff's medications at that time included Lexapro, Seroquel, and Clonazepam.  Id.  When Dr. Glass saw Plaintiff on September 29, 2008, he noted that Plaintiff was "still very anxious" with stimulation.  Id.  On October 20, 2008, Plaintiff was again still very anxious, even while using Clonazepam.  Tr. 294.  On November 21, 2008, Plaintiff was experiencing increased anxiety, and reported that he "feels unbearably hot, nauseous," and that

his food intake decreased.  Tr. 295.  Plaintiff's dosage of Clonazepam was increased, and he continued Lexapro.  Id.  On November 28, 2008, Plaintiff reported to Dr. Glass that "the more I do the more I have racing thoughts," and that he stayed in bed all the time.  Tr. 296.  On December 6, 2008, Plaintiff was "still very anxious," Tr. 296, and on December 11, 2008, he reported increased anxiety, that he was shaky, that his sleep had decreased, and that he spent a lot of time in bed.  Tr. 297.  On December 24, 2008, Plaintiff reported "intense burning heat of body."  Id.

On January 12, 2009, Plaintiff reported feeling worse, with increased anxiety.  Tr. 301.  Plaintiff was feeling weaker and was still experiencing intervals of burning hot sensations of the nerves.  Id.  Since beginning Alprazolam, Plaintiff's panic attacks had decreased.  Id.  Plaintiff's dosage of Mirtaziprine was decreased and he was continued on Lexapro, Alprazolam, and Seroquel, and given a prescription for Oxcarbazepine.  Tr. 301.  On February 16, 2009, Dr. Glass noted that Plaintiff was "still locked into anxiety hard" and had a lot of self worry.  Tr. 304.  On March 9, 2009, Plaintiff was doing more to help out around the house due to his father's back injury.  Tr. 304.  He reported that he had to "cool off" two to three hours before bed, and that as his anxiety builds, he gets hot.  Id.  He began taking Propanolol.  Id.  On April 13, 2009, Dr. Glass noted that Plaintiff's anxiety was not as good, and he was over sedated.  Tr. 305.  On May 11, 2009, Plaintiff was "not as good," with increased heat again.  Tr. 306.  On July 6, 2009, Plaintiff reported that he spent time helping around the house and garden, but that he still gets hot feelings and does not have endurance.  Tr. 307-08.

On December 7, 2009, Dr. Glass filled out a psychiatric report in which he indicated that Plaintiff could: recall words immediately and after five minutes; recall contents from earlier in the session, events of the past week, and long term events; spell the word "world" forwards and

backwards; and track conversation. Tr. 272. He also noted that Plaintiff was preoccupied, anxious, and paralyzed by anxiety, Tr. 274-75, but that he had not had any panic attacks recently, Tr. 273. Dr. Glass rated Plaintiff as "limited" in the following work-related categories: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Tr. 274.

Plaintiff continued to see Dr. Glass after applying for SSI. On January 4, 2010, Dr. Glass noted that Plaintiff still felt "wound up" and complained of head pressure and abdominal heat. Tr. 354. On April 1, 2010, Plaintiff still had head pressure and body heat, and continued taking Alprazolam, Propanolol, Seroquel, Mirtaziprine, and Lexapro. Id. On January 31, 2011, Plaintiff was experiencing increased anxiety, and decreased ability to nap. Tr. 358.

On May 16, 2011, Dr. Glass completed a Mental Impairment Medical Source Statement ("MIMSS"). Dr. Glass reported that side effects of Plaintiff's medication were drowsiness, lethargy, and fatigue, and indicated that they would be mildly troublesome for up to 33% of an eight hour workday. Tr. 348-49. Plaintiff's prognosis was "unlikely to improve." Tr. 349. Regarding Plaintiff's signs and symptoms, Dr. Glass noted the following: decreased energy; blunt, flat or inappropriate affect; generalized persistent anxiety; mood disturbance; persistent disturbances in mood or affect; apprehensive expectation; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; manic syndrome; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes; and persistent irrational fear of a specific

5

object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation.  Tr. 349-50.

  Dr. Glass opined that the Plaintiff was unable to meet competitive standards with mental abilities and aptitudes needed to do unskilled work in the following areas: remembering work-like procedures; maintaining attention for a two hour segment; maintaining regular attendance and punctuality within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting, and dealing with normal work stress.  Tr. 350.  Dr. Glass indicated that Plaintiff was seriously limited, but not precluded, from performing unskilled work in the following areas: understanding and remembering very short and simple instructions; carrying out very short and simple instructions; working in coordination with or in proximity to others without being unduly distracted; asking simple questions or requesting assistance; and being aware of normal hazards and taking appropriate precautions.  Tr. 350.

  With regard to all jobs, Dr. Glass indicated that Plaintiff was unable to meet competitive standards for interacting appropriately with the general public, and maintaining socially appropriate behavior.  Tr. 351.  Regarding Plaintiff's ability to do semiskilled and skilled work specifically, Dr. Glass opined that Plaintiff was unable to meet competitive standards in all categories because of his anxiety, obsessive-compulsive disorder, and his learning disability.  Tr.

6

351. Dr. Glass indicated that Plaintiff's learning disability was based on his V IQ of 111, and his PIQ of 91, as well as an abnormal EEG. Tr. 351.

Furthermore, Dr. Glass noted that Plaintiff had marked limitations in maintaining social functioning, and in concentration, persistence, or pace. Tr. 352. Plaintiff had a medically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. Id. Dr. Glass also indicated that Plaintiff had an anxiety-related disorder and complete inability to function independently outside the area of one's home. Id. The impairments were expected to last at least 12 months and had persisted since at least October 2009. Tr. 353.

Dr. Glass completed a Medical Listing Questionnaire on June 18, 2011. Tr. 361. In this questionnaire, he indicated that Plaintiff's impairments of bipolar disorder and a learning disability met the criteria of Medical Listing 12.02. Tr. 361. He also noted that Plaintiff had been suffering from depression since December 2003, without treatment until April 17, 2006. Tr. 362.

On May 21, 2011, Plaintiff had an unremarkable, nonenhanced MRI on the brain. Tr. 360.

### iii. Plaintiff's Testimony

Plaintiff testified at his June 28, 2011 hearing before the ALJ. Plaintiff testified that concentrating too long gives him anxiety that builds up and causes fatigue. Tr. 36. Plaintiff's anxiety became "really, really bad in September of 2008." Tr. 32. At that point, he began

experiencing constant anxiety attacks or panic attacks, at which point he was put on lots of medications.  Tr. 32.  He testified that he is taking the "maximum amount of tranquilizers that you can."  Tr. 34.

Plaintiff testified that he does chores around the house, but that he can only perform them for one to two hours, "and then I need to take time off because my anxiety builds up to a point where I start feeling hot and nauseous and I, I need to go in and rest."  Tr. 33.  He becomes fatigued "after I do physical activities and just, just being around the house."  Tr. 35.  Plaintiff testified that the fatigue is on a daily basis, "because the more I do, the worse I feel."  Tr. 36.  At home, Plaintiff's parents and brother offer assistance and make dinner for him.  Tr. 38.  He occasionally shops for himself, but he does not normally go out.  Tr. 37, 39.  Plaintiff has a driver's license and drives a car that is insured under his father's name.  Tr. 33.  Plaintiff testified that he only drives 15 to 20 minutes from home because he is worried he might experience symptoms and need to get picked up.  Tr. 34-35.  He starts to feel hot and nauseous and experiences fatigue due to anxiety and increased heart rate.  Tr. 35.

### iv.  Psychiatric Review Techniques

Medical Consultant Jane Shapiro completed a Psychiatric Review Technique ("PRT) on April 21, 2010.  Tr. 310.  She determined that Plaintiff had a medically determinable impairment under Section 12.02 of a mild learning disability, Tr. 311, Section 12.04 for Affective Disorders, and Section 12.06 for Anxiety-Related Disorders, Tr. 310.  However, a later, July 20, 2010 PRT completed by Dr. Burstein only indicated a medically determinable impairment under Section 12.06 of an anxiety disorder.  Tr. 339.

## II.     STANDARD FOR REVIEW OF COMMISSIONER'S DECISION

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360). A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)). Furthermore, evidence is not

substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III. DISCUSSION

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore eligible for SSI benefits. 20 C.F.R. § 404.1520(a)(4); Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in any "substantial gainful activity." Such work activity bars the receipt of benefits. 20 C.F.R. § 404.1520(b). The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have such a severe impairment that limits her ability to do basic work activities, the claim will be denied. Id. If the Commissioner finds that the claimant's condition is severe, the Commissioner moves to the third step and determines whether the impairment meets or equals the severity of a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is equivalent to a listed impairment, then it is presumed that the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the RFC would enable the claimant to return to her "past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work precludes a finding of disability. 20 C.F.R. § 404.1520(f). If the Commissioner finds the claimant unable to resume past relevant work, in the fifth and final step, the Commissioner determines whether the claimant can adjust to other work. 20 C.F.R. § 404.1520(g). If the claimant has the capacity to perform other work available in significant

numbers in the national economy, based upon factors such as the claimant's age, education and work experience, the claimant will be found not disabled.  Id.  If the claimant cannot make an adjustment to other work, she will be found to be disabled.  Id.

### A. The ALJ's Decision

The ALJ determined that Plaintiff was not under a disability within the meaning of the Act since the application and alleged onset date of October 16, 2009.  Tr. 13.  The ALJ began his analysis by determining that Plaintiff had not engaged in substantial gainful activity since the application date.  Tr. 15.  At step two, without any explanation, the ALJ found that Plaintiff "has the following severe impairment: Anxiety Disorder."  Id.  Moving to the third step, the ALJ determined that Plaintiff's impairment did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Id.  The ALJ considered listing 12.06, but determined that Plaintiff did not satisfy the criteria of paragraph B, which would require that the mental impairment result in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  Id.  The ALJ found only a mild restriction in activities of daily living; mild difficulties in social functioning; mild difficulties in maintaining concentration, persistence, or pace; and that Plaintiff "has not experienced one to two episodes of decompensation, each of extended duration." Tr. 16.

Next, the ALJ determined that Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitation: the claimant is unable to perform in a skilled or semi-skilled job, due to his limited ability to cope with stress."  Id. Notwithstanding this finding, the ALJ determined that Plaintiff could work in an unskilled

occupation.  Id.  In making this determination, the ALJ found that the Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 17.  Furthermore, the ALJ gave little weight to Dr. Glass's opinions because his findings were inconsistent.  Tr. 18.  Firstly, Dr. Glass opined that Plaintiff suffered from a learning disability, but Plaintiff's June 2006 EEG was only "mildly abnormal," and a May 2011 MRI "directly refutes this finding." Tr. 17-18.  Additionally, Dr. Glass described Plaintiff as "preoccupied and anxious," even though he reported that Plaintiff had not recently experienced any panic attacks.  Tr. 17.  The ALJ also determined that Dr. Glass's finding that Plaintiff had a limited capacity for sustained concentration and persistence was inconsistent with the doctor's own testing methodologies, which revealed that Plaintiff could recall words after five minutes had elapsed, recall long and short-term events, and spell the word "world" backwards.  Tr. 18.  The ALJ thus gave little weight to the MIMSS form that Dr. Glass completed.  Id.  Moreover, the ALJ found that Dr. Glass's treatment notes "are nearly illegible and do not provide any meaningful detail into [Plaintiff's] condition . . . The Doctor's assessments are simply inconsistent with [Plaintiff's] mental feat of graduating summa cum laude with a Bachelor's Degree in Civil Engineering, together with the testimony elicited." Tr. 18-19.

At step four, the ALJ determined that Plaintiff had no past relevant work.  Tr. 19.  Finally, at step five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform, and thus he was not under a disability as defined by the Act.  Tr. 19.

> **B. The ALJ erred in failing to examine Plaintiff's learning disability, bipolar disorder, obsessive-compulsive disorder, and depression at step two, and in failing to consider these impairments in the formulation of RFC.**

At step two, the Commissioner must determine whether a plaintiff has a medically determinable impairment that is severe. 20 C.F.R. § 404.1520. Furthermore, the ALJ must consider the symptoms of both medically determinable severe <u>and</u> non-severe impairments when setting the claimant's RFC. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). Plaintiff claims that the ALJ erred in failing to find Plaintiff's learning disability, bipolar disorder, obsessive-compulsive disorder, or depression to be severe impairments at step two of the analysis. Pl.'s Br. 13. Plaintiff further alleges that it was error for the ALJ not to consider these impairments in the formulation of his RFC, whether or not they were determined to be severe. Pl.'s Br. 13-14. Plaintiff argues that his learning disability, bipolar disorder, obsessive-compulsive disorder, and depression are medically determinable impairments, and that a remand is appropriate to determine whether they are severe. Pl.'s Br. 15-17.

The Court agrees with Plaintiff and finds remand appropriate so that the ALJ can consider whether Plaintiff's learning disability, obsessive-compulsive disorder, bipolar disorder, and depression were severe impairments at step two. The ALJ did not make a determination as to whether any of Plaintiff's conditions besides his anxiety disorder were medically determinable or severe at step two. Instead, without any explanation, the ALJ merely opined that "[t]he [Plaintiff] has the following severe impairment: Anxiety Disorder." Tr. 15. This Court is left to piece together clues from other portions of the ALJ's decision to determine what he found regarding these mental impairments. While there is some indication that the ALJ considered some of Plaintiff's other mental impairments in formulating the RFC, he does not consider all of the alleged impairments, and, to the extent that he may have considered some of them, the ALJ's opinion is at best ambiguous in this regard.[1]

---

[1] Specifically, the ALJ stated that "Dr. Glass noted that claimant suffers from a learning disability," Tr. 17, and that Plaintiff "is alleged to suffer from Bipolar Disorder and a Learning Disability," Tr. 18.

13

In any event, it is clear that the ALJ determined that Plaintiff only had one severe impairment at step two.  The ALJ is required to consider all relevant evidence and provide an explicit rationale for his decision.  See Cotter v. Harris, 642 F.2d 700, 705 (3d. Cir. 1981) ("[W]e need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.")  A reviewing court must know the basis for the decision so that it may "'properly exercise its responsibility under 42 U.S.C. s 405(g) to determine if the Secretary's decision is supported by substantial evidence.'" Id. (quoting Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974)).  Because the ALJ failed to describe what evidence, if any, he considered at step two with regard to Plaintiff's learning disability, obsessive-compulsive disorder, bipolar disorder, or depression, the Court will remand for further proceedings.  On remand, the ALJ should consider whether these impairments are medically determinable, and if so, whether they are severe.

Contrary to the Commissioner's argument that such error is harmless because the ALJ found in favor of Plaintiff at step two, the Court finds that this error is not harmless because of the ALJ's failure to consider these impairments in the formulation of RFC.  If the ALJ were to have determined that any of Plaintiff's conditions besides the anxiety disorder were medically determinable, even if he found these impairments non-severe, he would still be required to consider them in formulating the RFC.  See SSR 96-8p, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'")  As previously noted, there is no indication as to whether the ALJ found Plaintiff's impairments to be medically determinable, and it is unclear whether the ALJ

14

considered any of Plaintiff's other mental impairments in formulating the RFC. For these reasons, remand is appropriate.

### C. The ALJ erred in giving little weight to Dr. Glass's opinion.

Plaintiff argues that the ALJ erred in according little weight to Dr. Glass's opinion. Pl.'s Br. 21. This Court agrees with Plaintiff that the ALJ's rejection of Dr. Glass's opinion was not supported by substantial evidence, and finds remand appropriate for reconsideration of this issue.

Firstly, the ALJ found Dr. Glass's opinions inconsistent because Dr. Glass noted that Plaintiff suffered from a learning disability, but Plaintiff's EEG was only "mildly abnormal" and a more recent MRI "directly refutes this finding." Pl.'s Br. 21. Plaintiff's June 2006 EEG was "mildly abnormal." Tr. 285. Dr. Goldberg opined that the results of the EEG were "enough for the neurologist to assess the presence of a cognitive problem." Tr. 265. In addition to the abnormal EEG, Dr. Goldberg also noted a "marked disparity" between Plaintiff's verbal and performance IQ scores, and determined that "[t]he kind of problem suggested by the neurological testing is well confirmed by the pattern of the IQ test." Tr. 267. Dr. Glass, in his Medical Listing Questionnaire, relied on Dr. Goldberg's assessment, indicating that Plaintiff had a learning disability as shown by a 20 point discrepancy between verbal and performance IQs. Tr. 361. In his MIMSS, Dr. Glass also indicated that Plaintiff had a learning disability as shown by an "abnormal EEG" and a "VIQ 111" versus a "PIQ 91." Tr. 351. While the record does indicate that a May 2011 MRI was "unremarkable," Tr. 360, an MRI is a different diagnostic exam than an EEG, and no later EEG was undertaken.

The ALJ's reliance on a single piece of evidence, the normal MRI, to reject a diagnosis of a learning disability that was based on clinical factors and an abnormal EEG, was not supported by substantial evidence.

> A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g. that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114). Moreover, the Third Circuit gives great weight to treating physicians. See Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (finding that the ALJ "improperly supplanted the opinions of [Plaintiff's] treating and examining physicians with his personal observation and speculation…an ALJ may not make speculative inferences from medical reports.") (internal quotations omitted). Here, the ALJ inferred from the MRI that Plaintiff did not have a learning disability, discounting the clinical evidence of Plaintiff's prior EEG, and not taking into account Plaintiff's discrepancy in IQs. The ALJ thus failed to give proper weight to Dr. Glass's opinion.

Plaintiff next argues that the ALJ erred in finding Dr. Glass inconsistent when the doctor said that Plaintiff was preoccupied, anxious, and paralyzed by anxiety, but that he had not had any panic attacks recently. Pl.'s Br. 22. Dr. Glass's single note about panic attacks cannot properly be the basis for the ALJ to reject Dr. Glass's opinion because numerous other treatment notes confirm Plaintiff's anxiety. For example, on August 1, 2008, Dr. Glass noted increased anxiety. Tr. 291. On September 22, 2008, Dr. Glass noted "panic/anxiety constant," and on September 29, 2008 Plaintiff was "still very anxious" with stimulation. Tr. 293. On October 20, 2008, Dr. Glass noted again that Plaintiff was still very anxious, despite his medication. Tr. 294. On November 21, 2008, Plaintiff reported increased anxiety, and feeling "unbearably hot, nauseous," and on December 6, 2008 he was "still very anxious." Tr. 295-96. Dr. Glass's treatment notes continue to reference Plaintiff's anxiety into 2010, with Dr. Glass noting on January 4th that Plaintiff still had anxiety issues, head pressure and abdominal heat. Tr. 354. As

discussed, a single piece of evidence does not constitute substantial evidence if the ALJ ignores or fails to resolve countervailing evidence. The ALJ merely concluded that the lack of panic attacks is inconsistent with Plaintiff having anxiety, and thus the ALJ did not properly find that Dr. Glass's opinion deserved little weight in this regard.

Next, Plaintiff argues that the ALJ erred in finding Dr. Glass's opinion that the Plaintiff had a limited capacity for sustained concentration and persistence inconsistent with his own examination findings. Pl.'s Br. 22. Because of this inconsistency, the ALJ gave little weight to the MIMSS that Dr. Glass completed. Tr. 18. The form on which Dr. Glass indicated that Plaintiff was limited in sustained concentration and persistence asked the medical provider whether Plaintiff would be limited in his ability to: "follow simple or detailed instructions, follow[] schedules, work with others, follow a reasonable pace, sustain ordinary routine without supervision, maintain customary attendance and punctuality." Tr. 274. What the ALJ finds contradictory is Dr. Glass's report that Plaintiff was able to recall words immediately and after five minutes elapsed, that he was able to recall content from earlier in the session, as well as long and short-term events, that he was able to spell the word "world" forwards and backwards, and that he was able to track conversation. Tr. 18.

The Court finds that nothing regarding Plaintiff's ability to recall, to spell words backwards, or to track conversation, which were revealed through Dr. Glass's testing, is indicated in the areas of sustained concentration and persistence that Dr. Glass found to be limited in Plaintiff. Furthermore, Dr. Glass indicated in his MIMSS that Plaintiff would be "seriously limited, but not precluded" from understanding and remembering very short and simple instructions, and from carrying out short and simple instructions, which is consistent with the findings from his testing of Plaintiff. Tr. 351. Once again, the ALJ rejected Dr. Glass's

17

report due to his own speculation and lay opinion, which was not based on substantial evidence. See Morales, 225 F.3d at 317.

Furthermore, Plaintiff argues that the ALJ erred in finding that Dr. Glass's treatment notes "are nearly illegible and do not provide any meaningful detail into [Plaintiff's] condition." Pl.'s Br. 23.  Contrary to the ALJ's determination, this Court finds Dr. Glass's notes both legible and supportive of Plaintiff's conditions.  As shown by the sampling of treatment notes provided above, a significant number of Dr. Glass's notes relate directly to Plaintiff's anxiety disorder.  In fact, Dr. Glass's notes and opinions make up the majority of the medical record in this case.  If the ALJ did in fact give "little weight" to the opinion of Dr. Glass, the Court wonders whose opinion the ALJ relied upon, as the ALJ did not explain as much in his decision.  Plus, even if an ALJ does not find that a treating physician's opinion is entitled to "controlling weight, … [t]reating source medical opinions are still entitled to deference." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).  This is especially true when the physician (Dr. Glass) has treated the patient for a long period of time (nearly six years), on a frequent basis (monthly), in his specialty area (psychiatry) and his opinions are consistent with the record as a whole (specifically Dr. Goldberg's report).  See 20 C.F.R. § 404.1527(c) (listing factors to be considered when determining what weight to give a medical opinion).  Thus, it was error for the ALJ to give Dr. Glass's opinion little weight.

Finally, the ALJ opined that Dr. Glass's "assessments are simply inconsistent with [Plaintiff's] mental feat of graduating summa cum laude with a Bachelor's Degree in Civil Engineering." Tr. 19.  Plaintiff argues that the ALJ erred in relying on Plaintiff's experience in college, which he graduated from nearly five years prior to his alleged onset date. Pl.'s Br. 19.  This Court agrees.  Plaintiff further argues that even if the ALJ believed Plaintiff's performance

18

in college was relevant, there is evidence in the record differentiating Plaintiff's ability to excel in college from his inability to work in a professional setting, which the ALJ rejected without explanation.  Pl.'s Br. 20.  For this the ALJ was in error.  For example, Dr. Goldberg stated that "[i]n school, [Plaintiff] could find a space to work by himself without anyone else depending on his product or watching what he did.  In the work force, he had to now perform on a team and in front of others."  Plaintiff similarly testified that in college he could "spend as much time" as he needed on homework, whereas "in a work situation, there were deadlines that were . . . a lot harder to meet.  They required me to work at a faster pace than I could and so I just couldn't keep up with . . . the pace of work."  Tr. 36-37.  See Landeta v. Comm'r of Soc. Sec., 191 Fed. App'x. 105, 110 (3d Cir. 2006) ("The ALJ's failure to address evidence in direct conflict with his/her findings or to reject uncontradicted evidence without a clear statement of the reasoning is erroneous.")

## IV.    CONCLUSION

For the foregoing reasons, the Court will vacate the Commissioner's final decision and remand the matter for further proceedings consistent with this Opinion.  An appropriate order shall enter.


Dated:      12/2/2014                                          s/ Robert B. Kugler
                                                                                                            ROBERT B. KUGLER
                                                                                                            United States District Judge